NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Public Protection Fund Committee
No. 2016-0427

APPEAL OF ESTATE OF BEATRICE JAKOBIEC
(New Hampshire Bar Association Public Protection Fund Committee)

Argued: April 19, 2017
Opinion Issued: November 30, 2017

Law Office of Steven M. Latici, P.A., of Gilmanton (Steven M. Latici on the brief and orally), for the claimant.

Bussiere & Bussiere, P.A., of Manchester (Keith F. Diaz on the brief and orally), for the respondent.

HICKS, J. The claimant, Edmund Hibbard, Esq., Administrator of the Estate of Beatrice Jakobiec (Estate), appeals a decision of the respondent, New Hampshire Bar Association Public Protection Fund Committee (PPFC), finding that the Estate is entitled to reimbursement from the Public Protection Fund (PPF) in an amount significantly less than that which the Estate claims was stolen by former attorney Thomas Tessier. We reverse in part, vacate, and remand.

The following facts are taken from the Auditor's Report in Tessier's disciplinary proceeding in the Attorney Discipline Office (ADO), which was appended to the Estate's statement of claim to the PPFC and appears in the

record.  These facts do not appear to be disputed and, in any event, are recited for background only.

Beatrice Jakobiec passed away on May 11, 2001, leaving two sons, Frederick A. Jakobiec, M.D. and Thaddeus Jakobiec, Jr., as heirs.  On June 26, 2002, Tessier was appointed to administer the Estate.  He filed a first and final account for the Estate with the probate court on April 10, 2003, valuing the Estate at $280,124.00.  The actual value of the Estate for probate purposes, as determined by the auditor for the ADO, was $576,074.03.  The auditor concluded that "[t]he assets included in the Estate by Attorney Tessier were valid and belonged in the Estate valuation," but that Tessier failed to include additional assets owned by Beatrice at the time of her death.  In particular, certain bank certificates of deposit owned by Beatrice were canceled by Tessier, with the proceeds issued by check payable to the Estate or to Tessier as administrator of the Estate.  The auditor for the ADO concluded that it appeared Tessier took the proceeds "for his own purposes."  The auditor further noted that Tessier received and presumably "utilized . . . for his own purposes" a refund on insurance premiums that was due the Estate.  In addition, the auditor detailed Tessier's misappropriation, using fraudulent powers of attorney, of funds belonging to Frederick individually or held in trust for Thaddeus, who has been blind since birth.

On April 2, 2009, the Estate filed its claim in the instant matter, alleging a loss, as restated in its memorandum and at the hearing at the PPFC, in the gross amount of $404,830.76.  The Estate's total loss consisted of $208,798.95 in stolen assets (the Stolen Assets), $96,500.00 in stolen legal fees, and $99,531.81 in lost income.  In support of its claim for stolen legal fees, the Estate alleged that "assets of the estate were deposited to the . . . client trust account" of Tessier's law firm and that "Tessier directed the unlawful periodic payment of legal fees to his law firm and himself."  With respect to the Estate's lost income claim, the PPFC noted that, according to the Estate's offer of proof, that claim sought "to recover the opportunity cost arising from the alleged theft of the CDs, legal fees, and insurance premium," and was supported by the Estate's attorney's "simple interest calculations applying Moody's average AAA Corporate Bond Rate of 5.68% for 2002-2008."

Against the gross amount of its loss, the Estate credited the net recoveries it obtained from third parties: specifically, $180,896.00 from the probate bond and $14,211.18 from the certified public accountant (CPA) who had prepared the Estate's federal tax return.  The gross amounts of those recoveries were $250,000.00 and $20,000.00, respectively.  The PPFC noted that "[a]ccording to the [Estate's] offer of proof at the hearing, the difference between the gross and the net recoveries represented attorney's fees incurred

2

in collecting the recoveries.  After applying these net recovery credits, the Estate submitted a claim of $209,723.76."[1]

The PPFC found "that the Estate has established by a preponderance of the evidence that it suffered a loss in assets of $208,798.95 for the five [certificates of deposit omitted from the probate accounting] and insurance premium, and that these amounts were stolen."  It also found that $89,686.07 (the Stolen Legal Fees) of the $96,500.00 in legal fees claimed to have been misappropriated by Tessier "were stolen and are reimbursable."  The discrepancy in those amounts is due to the PPFC's finding that two checks (the Excluded Checks) claimed to represent stolen legal fees "appear to have been for the benefit of Thaddeus Jakobiec and are not properly reimbursed here."  The PPFC also found that "the Estate's claim for lost income is not eligible for recovery" under New Hampshire Supreme Court Rule 55(4).  Totaling the Stolen Assets and Stolen Legal fees, the PPFC found the gross amount of $298,485.02 to be eligible for reimbursement.  From that amount, the PPFC deducted the gross amounts the Estate recovered from the probate bond and the CPA ($250,000.00 and $20,000.00 respectively), to arrive at a net eligible recovery of $28,485.02.  The PPFC then concluded:

> The [PPFC] further finds that there are only two beneficiaries of the Estate, Frederick and Thaddeus Jakobiec.  The [PPFC] previously has found [in a proceeding on a separate claim on the PPF made by Thaddeus] that Thaddeus Jakobiec has been fully compensated for losses suffered by Mr. Tessier's defalcations, and accordingly reduces the Net Eligible Recovery by half to $14,242.51.

In the PPFC proceeding regarding Thaddeus (the Thaddeus Jakobiec Proceeding), the PPFC relied upon a probate court decision involving a trust established for Thaddeus's benefit (the Smillie Trust).  See In re Trust of Lillian M. Smillie, Case No. 2010-0675, 2011 WL 13092686 (N.H. Dec. 8, 2011) (unpublished decision affirming probate court order).  In that proceeding, the PPFC quoted a portion of the probate court's order explaining arrangements made to reimburse Thaddeus and Frederick for funds taken by Tessier:

> Thomas Tessier hired Attorney William Boesch to represent him in this process, and Attorney [Regina] Rockefeller [hired by the Claimant's brother, Frederick Jakobiec, to investigate Tessier's actions] and Boesch worked together extensively for many months.  Together, the attorneys agreed that making Thaddeus whole was

---

[1]  The Estate appears to have made a mathematical error, as its gross claim less net recoveries equals $209,723.58.

3

their first priority. The attorneys reviewed documents from the Smillie Trust, Beatrice Jakobiec Estate, Thaddeus Jakobiec Irrevocable Trust, receipts, valid expenditures for his care, and calculated his share of his mother's estate expenses and taxes. It was agreed that, as of December 18, 2006, the full amount due Thaddeus Jakobiec under the Smillie Trust, $110,162.53, was in the Smillie Trust accounts when Rockefeller and James Goves, MD, the present petitioners, became the successor trustees of the Smillie Trust in 2006. As it turns out, although not at issue in these proceedings, the full amount due Thaddeus Jakobiec under his Irrevocable Trust ($199,963.12) was also then in the trust account, plus a whole lot more he wasn't entitled to, as it turned out. The excess funds were also returned for the benefit of Frederick Jakobiec, through Attorney Rockefeller. Thaddeus Jakobiec had been made whole in both respects, through one means or another, as of December 18, 2006.

On appeal in the instant case, the Estate argues that the PPFC erred by: (1) reducing the amount of its claim by fifty percent based upon an "earlier finding that Thaddeus Jakobiec . . . had received his full distribution from the Estate"; (2) reducing the Estate's claim for stolen legal fees by the amounts of the Excluded Checks; (3) finding that the Estate's claim against the PPF included a claim for lost income; and (4) "applying credits for prior recoveries by the Estate for the gross amount of those recoveries rather than the net amount of the recoveries." "Decisions of the PPFC as to whether or not to pay claims and the amount of payments shall be within the PPFC's discretion and will be reviewable only for unsustainable exercise of discretion." Appeal of Stacy, 164 N.H. 706, 712 (2013) (quotation, brackets, and ellipsis omitted); see Sup. Ct. R. 55(5).

The Estate first challenges the fifty percent reduction of its claim. It argues that the PPFC "only has jurisdiction to determine the amount of each claim submitted" and, specifically, "has no jurisdiction to reduce the assets of the probate estate or otherwise interfere with the distribution of those assets." It asserts that "[a]s an asset of the estate the 'net eligible recovery' is subject to the claims of creditors of the estate."

In response, the PPFC contends that "[t]he Estate appears to equate the PPFC's decision to a court ordered distribution of Estate assets." The PPFC rejects that characterization of its order, and asserts instead that its decision merely limited the amount reimbursed by the PPF to the Estate's "actual losses."

We conclude that the PPFC unsustainably exercised its discretion in failing to recognize the Estate, or its administrator, as an entity distinct from

Thaddeus Jakobiec, one of the Estate's beneficiaries. The PPFC's reasoning is analogous to an argument rejected by the court in Bingham v. Zolt, 66 F.3d 553 (2d Cir. 1995), an action seeking damages from a decedent's attorney and accountant for "allegedly divert[ing] . . . assets and . . . income from [the decedent's] estate to themselves." Bingham, 66 F.3d at 556-57. On appeal, the defendant attorney argued that "the estate suffered no loss because the funds from the estate's 'offshore' companies and its bank accounts were distributed to estate beneficiaries who were entitled to receive them or were used to pay for the estate's legitimate expenses." Id. at 563. The court disagreed, noting that the "[d]efendant's argument is fundamentally flawed, to the extent that he incorrectly assumes that the beneficiaries of the estate are indistinguishable from the estate itself. An estate, of course, is an entity separate and distinct from its beneficiaries." Id. But cf. 33 C.J.S. Executors and Administrators § 5 (2009) ("The estate of a deceased person is not an entity known to the law, and is not a natural or an artificial person, but is merely a name to indicate the sum total of assets and liabilities of a decedent." (footnotes omitted)).

It does not appear that we have previously referred to a decedent's estate as an "entity." Cf. Lisbon Sav. Bank &c. Co. v. Moulton's Est., 91 N.H. 477, 481-82 (1941) (noting that "[a]s an artificial person distinct from himself as an individual, an executor is a creation of the law," under a "legal concept . . . analogous to that of a corporation"). Nevertheless, in the context of suits relating to the decedent's personal estate, we have recognized a distinction between the estate and/or its administrator, on the one hand, and the estate's beneficiaries, on the other. See Scamman v. Sondheim, 97 N.H. 280, 281 (1952) (noting general rule that "an executor or administrator is the only proper party to bring or defend actions relating to the personal estate of the deceased" and that, by "contrast, heirs and legatees are not parties in interest, in the legal sense of the term, in a proceeding by or against the representative of the estate, any more than creditors" (quotation omitted)). Accordingly, we recognize the Estate's status as an "entity" solely to denote its separate existence vis-à-vis its beneficiaries. Cf. RSA ch. 556 (2007 & Supp. 2016) (providing for suits by and against administrators). With that said, we agree with the analysis in Bingham, and conclude that the PPFC unsustainably exercised its discretion "to the extent that [it] incorrectly assume[d] that the beneficiaries of the estate are indistinguishable from the estate itself." Bingham, 66 F.3d at 563.

The PPFC nevertheless defends its decision as being consistent with Supreme Court Rule 55's purpose of reimbursing only actual losses not recoverable from another source. Thus, it contends that "the PPFC determined that if the Estate was entitled to reimbursement from the PPF, the payment had to be limited to actual losses and, consequently, could not include the Stolen Assets previously recovered and paid to Thaddeus Jakobiec." The PPFC,

however, found that the Estate, which we treat herein as a separate entity, did "suffer[] a loss in assets of $208,798.95" and in stolen legal fees in the amount of $89,686.07. Indeed, the PPFC's brief suggests that the real issue is not so much the calculation of the Estate's actual losses, but a concern about a double recovery by Thaddeus Jakobiec.

We acknowledge that the risk of double recovery presents a valid concern; we conclude, however, that it is one to be resolved by the probate division of the circuit court. Cf. Lisbon Sav. Bank &c. Co., 91 N.H. at 479 (noting that "[b]y the constitution and the statute, the probate court has exclusive, original jurisdiction of the settlement and distribution of the estates of deceased persons" and a court "has no power to . . . interfere with due administration therein" (quotation omitted)); RSA 547:3 (Supp. 2016) (jurisdiction of former probate court); RSA 490-F:3 (Supp. 2016) (establishing probate division of circuit court and granting jurisdiction of former probate court). We again take guidance from the court in Bingham:

> We recognize that neither [the decedent's wife] nor any other beneficiary can receive a double recovery . . . . But with the estate still in probate at the time of this damages action, it was not error to instruct the jury [not to consider the decedent's wife's entitlement, if any, as a beneficiary of the estate]. Once the amounts due the beneficiaries are ascertained in the probate proceeding, appropriate applications may be made to the . . . probate court or the trial court in this case to avoid a double recovery to the beneficiaries.

Bingham, 66 F.3d at 563-64. The Estate represents, and the PPFC does not refute, that "[t]he Estate of Beatrice Jakobiec remains open and the next accounting must identify the full amount of the 'net eligible recovery' as an asset of the estate." Accordingly, upon remand, the PPFC shall determine, consistently with this decision, the net eligible recovery due to the Estate and any issues regarding double recovery shall be taken up with the probate division thereafter.

The Estate next contends that the PPFC's "reduction of attorney's fees stolen from the Estate" in the amount of the Excluded Checks "was not supported by the evidence." The Estate asserts that the checks were "made payable to Thomas Tessier and there has never been any evidence produced that Thomas Tessier advanced [those funds] for Thaddeus' support."

The PPFC, on the other hand, contends that its decision is sustainably based upon its findings in the Thaddeus Jakobiec Proceeding. The PPFC notes that, in that proceeding, it found that "Attorney Rockefeller, representing the interests of Thaddeus, investigated Tessier's activities and obtained copies of

6

records, including records accounting for various expenditures made on behalf of Thaddeus." It further notes that "[b]ased on Rockefeller and Boesch's account reconciliation agreement," it concluded, in the Thaddeus Jakobiec Proceeding, "that the two draft orders properly paid Thaddeus' expenses and did not benefit Thomas Tesssier."

We reject the PPFC's argument for the same reason we struck down its halving of the Estate's claim: it fails to recognize the Estate as an entity distinct from Thaddeus Jakobiec. Whether "the two draft orders properly paid Thaddeus' expenses . . . [or] benefit[ed] Thomas Tesssier" is not the relevant question; rather, the issue is whether the Estate, as an entity distinct from its beneficiaries, suffered a loss of these funds due to Tessier's thefts. Accordingly, we remand for the PPFC to determine whether the Excluded Checks, which appear to have been written from the Estate's account to Tessier personally, were stolen from the Estate. Again, we note that any concerns about double recovery should be raised in the probate division.

The Estate next argues that the PPFC misconstrued its claim as seeking reimbursement of lost income from the PPF. The Estate explains:

> The lost income claim presented to the [PPFC] was for the limited purpose of establishing the gross amount of the Estate's claim in the probate bond litigation against which the net recovery should be applied for the purpose of ascertaining the net amount of the remaining claim against the [PPF].

Similarly, the Estate contends that the PPFC "further misapplied the gross amount of the prior recoveries to reduce the claim against the [PPF]." The PPFC counters that it correctly applied the language of Supreme Court Rule 55 in finding that "both the amount of money the Estate spent in attempting to collect stolen assets and interest on the amount lost" were not eligible for reimbursement from the PPF. (Capitalization omitted.) The PPFC cites Supreme Court Rule 55(4), which provides, in relevant part, that "[t]he maximum amount which may be paid on a claim shall be the dollar value of the money or property lost by the lawyer defalcation and shall not include interest on the amount lost or money spent attempting to collect the loss." Sup. Ct. R. 55(4).

We first address the parties' dispute over whether the amount deducted from the Estate's gross claim against the PPF to arrive at its net eligible claim should have been, as the Estate argues, its net recoveries from the probate bond and the CPA or, as the PPFC argues, its gross recoveries from those sources. The PPFC argues that it "properly exercised its discretion based on the Estate's offer of proof at the hearing: the net sum of the third party

7

recoveries ($195,107.18) was calculated by subtracting from the sum of gross recoveries ($270,000) the attorney fees it incurred while collecting its losses."

In its decision, the PPFC noted that "[a]ccording to the [Estate's] offer of proof at the hearing, the difference between the gross and the net recoveries represented attorney's fees incurred in collecting the recoveries." The Estate does not specifically challenge that finding on appeal.[2] The PPFC then reasoned that "[b]y deducting only its net recoveries on the probate bond and recovery from the CPA, the Estate is asking the [PPF] to reimburse money spent on collecting its losses," which "Rule 55(4) does not permit." We agree. Because, based upon the offer of proof credited by the PPFC and not disputed here, the net recoveries equal gross recoveries less attorney's fees, subtracting net recoveries adds attorney's fees into the calculation. Accordingly, we conclude that the PPFC's decision is consistent with Rule 55(4).

The Estate nevertheless cites RSA 556:14 to support its position that net, rather than gross, recoveries should have been deducted. That statute provides that, in a wrongful death action by the administrator, "the damages recovered, less the expenses of recovery, expenses of administration, taxes or other debts as approved by the probate court, shall become a part of the decedent's estate and be distributed in accordance with the applicable provisions of law." RSA 556:14 (2007). The Estate first asserts that its claim against the PPF "is no different than any other third party claim an administrator brings on behalf of the estate, including a wrongful death claim." Then, asserting that RSA 556:14 expresses "the clear statutory intent that only the net recovery by the estate shall be considered an estate asset," the Estate argues that applying the Estate's gross recoveries "in further reduction of [its] claim against the [PPF] runs contrary to" that intent.

We do not find the policy of RSA 556:14 to be at odds with the result reached here. That statute's specification of expenses to be paid out of the gross damages recovered serves "to deprive beneficiaries of a right to retain the amount of these expenses and to require payment over to creditors of the estate." Pike v. Adams, 99 N.H. 221, 223 (1954). The PPFC's decision here achieves a similar result: it prevents the Estate's beneficiaries from receiving a distribution — from the PPF — of the expenses of recovery. Accordingly, we conclude that the Estate has failed to demonstrate an unsustainable exercise of discretion with respect to the exclusion of expenses of recovery.

---

[2] Although the Estate represents that its claim on the probate bond included, in addition to lost income, "attorney's fees and exemplary damages," it does not appear to have included an amount for such a claim in the breakdown of its total claim on the bond set forth in its memorandum to the PPFC. Nor does it now argue that any portion of its recovery on the bond represents a legitimate recovery of attorney's fees. Accordingly, we need not consider how attorney's fees legitimately recovered from another source should be treated in a claim on the PPF.

8

Turning to the issue of lost income, the Estate argues that "[w]hile it is certainly true the regulations of the [PPF] do not permit the recovery against the [PPF] for lost income on the amounts stolen, it is not the case for a claim against Tessier as administrator of the Estate." The Estate notes that its claim against the probate bond included, among other things, lost income, but asserts that its net claim "against the [PPF] does not include lost income. It is simply the balance of the claim against the probate bond which legitimately included lost income."

The Estate's position, as we understand it, rests upon the recoveries it deducted from its gross claim ($195,107.18) exceeding the amount it calculated as lost income ($99,531.81). Employing the Estate's method of calculation in a case in which the amount of lost income exceeded recoveries from other sources would result in a claim against the PPF that included lost income. Nevertheless, because reimbursement from the PPF is capped at "the dollar value of the money or property lost by lawyer defalcation," Sup. Ct. R. 55(4), such inclusion would not affect the final reimbursement amount. The real issue is not whether the claim against the Estate "includes" lost income, because the PPF will not reimburse lost income in any event. Rather, the issue is whether a claimant should be allowed to recover lost income from another source without having to deduct that recovery from its claim against the PPF. We agree with the Estate that it should.

We interpret the rule establishing and governing the PPF in light of its stated purpose. Cf. Petition of Thayer, 145 N.H. 177, 183 (2000) (declining to construe supreme court rules regarding committee on judicial conduct in a manner that "would run counter to the manifest purposes of New Hampshire's system of judicial discipline").

> The purposes of the Public Protection Fund are to provide a public service and to promote public confidence in the administration of justice and the integrity of the legal profession by providing some measure of reimbursement to victims who have lost money or property caused by the defalcation of lawyers admitted to practice law in this jurisdiction occurring in New Hampshire and in the course of the client-lawyer or fiduciary relationship between the lawyer and the claimant.

Sup. Ct. R. 55(1). By its terms, the rule does not purport to guarantee full recovery from, or to ensure that a claimant is made whole by, the PPF. Rather, it seeks to provide "some measure of reimbursement," id., limited to no more than "the dollar value of the money or property lost by lawyer defalcation," Sup. Ct. R. 55(4). Nevertheless, while the rule prohibits the PPF from reimbursing a claimant for "interest on the amount lost or money spent attempting to collect the loss," we see nothing prohibiting a claimant from recovering lost income

9

from another source.  Id.  In other words, we see nothing prohibiting a claimant from being made whole, if other sources allow it, and we can think of no persuasive policy reason for preventing a claimant from utilizing other sources to obtain a full recovery.  See In re Proposed Public Protection Fund Rule, 142 N.H. 588, 591 (1998) (acknowledging that the PPF "may not cover all claims that arise" but noting that "other avenues of compensation will remain available to victims, including civil and criminal litigation" (emphasis added)).

In fact, the rule recognizes that other sources of reimbursement may exist, and requires a claimant to exhaust those other sources before receiving reimbursement from the PPF.  Sup. Ct. R. 55(4); see also In re Proposed Public Protection Fund Rule, 142 N.H. at 591 (stating that "[t]he PPF is designed as a last resort").  Thus, Rule 55 provides that "[p]ayments from the [PPF] shall be made only after exhaustion of all available assets, insurance, and sureties of the offending lawyer and the offending lawyer's law firm."  Sup. Ct. R. 55(4).  We read that provision (requiring exhaustion of other sources), together with the provision capping reimbursement at the dollar value of lost money or property, as a prohibition on double recovery.  Nevertheless, the rule does not specify how recoveries from other sources should be applied in calculating a claimant's claim against the PPF.

Because one of the purposes of the PPF is "to promote public confidence in the administration of justice and the integrity of the legal profession," Sup. Ct. R. 55(1), we conclude that an equitable allocation of recoveries that maximizes a claimant's total recovery from all sources (without providing double recovery) best effectuates that purpose.  Accordingly, we hold that where, as the Estate claims here, a claimant recovers on a claim against another source (here, the probate bond) that legitimately included lost income, the claimant is entitled to deduct its lost income recovery from its total recoveries from other sources before those recoveries are applied to reduce its claim against the PPF.

In essence, we are applying an equitable concept akin to marshaling in order to maximize the claimant's recovery.  Cf. Black's Law Dictionary 1121 (10th ed. 2014) (defining "marshal," in relevant part, as "[t]o arrange (assets, etc.) according to their liability or availability for payment of debts"); Lineham v. So. N.E. Prod. Credit Assoc., 122 N.H. 179, 182 (1982) (discussing "technique of protecting junior creditors . . . known as 'marshaling the assets',", under which, "[w]hen one creditor may have recourse to two funds more than ample for his full satisfaction, while a junior creditor has recourse to but one fund, which will prove inadequate for his payment if the senior creditor has primary recourse to it, the court will often 'marshal the assets' and compel the former to exhaust the fund on which he alone has a lien before allowing him to use the other fund" (quotation omitted)).  Here, a single claimant has access to alternative sources of recovery, but is required to exhaust all non-PPF avenues

before looking to the PPF, and, because the claimant may not have a double recovery, is required to deduct from its PPF claim any portion of that claim already recovered from another source. We conclude that, in order to preserve the claimant's legitimate recoveries from other sources of items not eligible for reimbursement from the PPF (e.g., lost income), the amount deducted must be the balance remaining after gross recoveries from other sources are first allocated to those PPF-ineligible recoveries.

Here, the PPFC found that it had no need to assess the legitimacy of the Estate's lost income claim because it found the claim ineligible for recovery in any event. It noted, however, "[a]s a preliminary matter, . . . that the Estate has not offered any expert testimony or report in support of its claim for lost income, and that this element of the claim could be found to be speculative." Accordingly, we cannot apply the rule we set forth above, but must remand for the PPFC to determine, in the first instance, whether the Estate has established a lost income recovery to deduct from its gross recovery on the probate bond.

In light of the foregoing, we reverse the PPFC's decision to reduce its award by half, vacate the award, and remand for further proceedings not inconsistent with this opinion.

<u>Reversed in part; vacated; and remanded</u>.

DALIANIS, C.J., and LYNN, BASSETT, and HANTZ MARCONI, JJ., concurred.